## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **THE ESTATE OF ANTHONY BARRÉ** | \* | **CIVIL ACTION NO. 17:1057** |
| **AND HIS SOLE HEIR, ANGEL BARRÉ** | \* | |
| | \* | **JUDGE:** |
| **VERSUS** | \* | **NANNETTE JOLIVETTE BROWN** |
| | \* | |
| **BEYONCÉ KNOWLES CARTER,** *et al*. | \* | **MAGISTRATE JUDGE:** |
| | \* | **MICHAEL NORTH** |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendants Beyoncé Knowles Carter, Parkwood Entertainment, Sony Music

Entertainment, Michael L. Williams III, Khalif Brown, Asheton Hogan, Eardrummers

Entertainment, Eardrummers Music Publishing, Oakland 13 Music, Warner-Tamerlane

Publishing Corp. (erroneously sued as Warner-Tammerlane Corporation), WB Music

Corporation, Pretty Bird Pictures, and Melina Matsoukas (collectively "Defendants") submit this

memorandum in support of their motion to dismiss the First Amended Complaint ("FAC") of the

Estate of Anthony Barré and Angel Barré (collectively "Plaintiffs"), for failure to state a claim.

## INTRODUCTION

In 2016, world-renowned musical artist Beyoncé released her album "Lemonade," which

included the single "Formation" (the "Song").  Critics praised the Song for its political and social

commentary, which, according to one music commentator, represented a "powerful statement of

black Southern resilience."[1]  Pretty Bird produced the Song's music video (the "Music Video"),

which featured numerous visual and auditory references to the culture and history of New

Orleans, including allusions to the devastating effects of Hurricane Katrina and elements

---

[1] *See* https://www.rollingstone.com/music/lists/our-favorite-songs-and-videos-right-now-
beyonce-kanye-west-and-more-20160302/beyonce-formation-20160302.

highlighting the city's fashion, architecture, dance, and vibrant street culture.  Among its many

references to New Orleans, the Music Video used a total of approximately ten seconds of audio

from two YouTube videos featuring Anthony Barré – also known as "Messy Mya" – walking

through the streets of New Orleans speaking to the camera and interacting with others along the

way (the "YouTube Videos").  About six seconds of that same audio was played at Beyoncé's

performances of the Song during the "Formation World Tour" (the "Live Performances").[2]

      As an initial matter, Plaintiffs have grossly overstated Defendants' use of the YouTube

Videos.  While they allege that Defendants used the YouTube Videos in the sound recording and

composition of the Song and during the Super Bowl halftime show, these allegations are

disproven by the works themselves.[3]  In reality, the snippets from the YouTube Videos were

used only in the Music Video and, to a lesser extent, during the Live Performances.  As a result,

all defendants without an alleged involvement in the Music Video or Live Performances should

be dismissed regardless of the merits of Plaintiffs' claims.  And while beyond the scope of this

motion, Pretty Bird licensed the YouTube Videos from Mr. Barré's family *before* plaintiff Angel

Barré had herself appointed as the administrator of the Estate of Anthony Barré (the "Estate")

weeks after the Music Video's premiere – presumably for the purpose of bringing this action.[4]

      Even in the absence of a license, however, the use of ten or fewer seconds of audio from

the YouTube Videos is protected by the fair-use doctrine.  The Music Video and Live

Performances used the audio as "raw material" that was "transformed in the creation of new

information, new aesthetics, new insights and understandings" – the "very type of activity that

---

[2] While the audio may not have been played at all of the Live Performances, Defendants assume that it was for purposes of this motion.

[3] The works were incorporated into the complaint by reference.  *See* Argument § 1.

[4] *See* FAC at ¶ 2.

the fair-use doctrine intends to protect for the enrichment of society." *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013). Indeed, Plaintiffs expressly allege that Defendants used the YouTube Videos "to create the tone, mood, setting and location of the New Orleans-themed 'Formation,'"[5] a highly transformative purpose compared to Mr. Barré's stream-of-consciousness musings.

This Court also should reject Plaintiffs' attempt to expand this case beyond the realm of copyright law by asserting claims for federal and state unfair competition and unjust enrichment. Plaintiffs' false-endorsement claim fails because the Lanham Act exists to protect consumers from confusion, not to provide a backdoor to claims for the use of a copyrighted work. Allowing Lanham Act claims like Plaintiffs' would create the sort of perpetual right in copyrighted works that the U.S. Supreme Court has expressly refused to recognize. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). Moreover, the First Amendment protects the use of Mr. Barré's voice in this context because, as Plaintiffs acknowledge, the use of the YouTube Videos has artistic relevance and does not explicitly mislead as to the source of the Music Video or Live Performances. *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). Plaintiffs' state-law claims also fail because they are duplicative of, or preempted by, their federal claims for relief.

For these reasons, Defendants respectfully request that the Court dismiss Plaintiffs' complaint in its entirety, with prejudice.

## BACKGROUND

### 1.    The Song

In 2016, Beyoncé released the Song as the lead single of her album "Lemonade."[6] The Song's lyrics explore Beyoncé's own cultural heritage, referring to Alabama as her "daddy" and Louisiana as her "momma." One of the Song's writers later explained that the Song "was really

---

[5] *See* FAC at ¶¶ 1 and  65.
[6] *See* recording of the Song, attached to the Motion to Dismiss as Exhibit 1.

more about [Beyoncé's] family … her heritage and where she comes from."[7]  The National

Academy of Recording Arts and Sciences nominated the Song for the Record of the Year and the

Song of the Year.[8]  The Song did not use any part of the YouTube Videos.[9]

**2.      The Music Video**

Pretty Bird produced the Music Video, which was "New Orleans-themed," and contained

numerous depictions and references to the city's culture and history.[10]  *Rolling Stone* magazine

praised the Music Video and its representation of black Southern culture, noting that:

> the video for 'Formation' does not settle for restrained allusions to black
> southern identity or an easy conversion of black southern into black
> American.  In her latest work, Beyoncé opts to tell a sweeping history of her
> southern identity and the black South writ large, bringing the weight of
> black New Orleans, past and present, and black women's and queer black
> men's cultures to the task.  The voices of black queer artists Messy Mya and
> Big Freedia provide opening context and guidance for the formation of
> country, southern black identity….  From the parlor to the street, the black
> South slays in rhythm and formation.[11]

In the opening of the Music Video, Beyoncé stands atop a police car in a flooded area of

New Orleans – alluding to Hurricane Katrina and its devastating effects.[12]  The Music Video

then shows scenes of New Orleans, including streets, an underpass, and images of police.

During this opening scene, the Music Video uses approximately four seconds of audio from a

five-minute-and-fourteen-second YouTube clip titled "Booking the Hoes from New Wildin,"

which showed Mr. Barré walking in New Orleans discussing a range of topics, primarily his

---

[7] *See* http://www.redbullmusicacademy.com/lectures/mike-will-made-it-lecture.
[8] *See* https://www.grammy.com/nominees.
[9] *See* Exhibit 1.
[10] *See* FAC at ¶ 1 and the Music Video, attached as Exhibit 2.
[11] *See* http://www.rollingstone.com/music/features/beyonces-black-southern-formation-20160208.
[12] *See* Exhibit 2.

contempt for several women he knew.[13]  In particular, the Music Video used audio of Mr. Barré

saying "what happened at the New Orleans," and "bitch, I'm back by popular demand."[14]  The

Music Video also used approximately six seconds of audio – of Mr. Barré saying "oh yeah baby.

Oh yeah, oh yes, I like that" – from a one-minute-and-fifty-three second YouTube clip titled "A

27 Piece Huh?" in which Mr. Barré admires a woman's haircut.[15]

Plaintiffs allege that the Music Video used the audio clips to "create the tone, mood,

setting and location of the New Orleans-themed 'Formation,'" and that Mr. Barré was "very

closely associated" with the city.[16]  Indeed, his life was cut short when he was gunned down on

the same streets that he walked in the YouTube Videos and that are depicted in the Music

Video.[17]  The Music Video also featured a voiceover from Big Freedia, a New Orleans-based

musician, and won the Grammy for Best Music Video.[18]

**3.      The Formation World Tour and Super Bowl 50 Halftime Show**

In 2016, Beyoncé performed in cities across North America and Europe on the Formation

World Tour.  At least some of the Live Performances – including the September 24, 2016

performance in New Orleans – used the six seconds of audio from "A 27 Piece Huh?" in which

Mr. Barré says "Oh yeah baby. Oh yeah, oh yes, I like that."[19]  Plaintiffs erroneously allege that

---

[13] *See* Exhibit 2; and "Booking the Hoes from New Wildin" YouTube clip, attached as Exhibit 3.
[14] *See* Exhibit 2.
[15] *See* Exhibit 2; and "A 27 Piece Hub?" YouTube clip, attached as Exhibit 4.
[16] *See* FAC at ¶¶ 1, 39, and 65.
[17] *See* http://www.nola.com/crime/index.ssf/2010/11/7th_ward_murder_victim_identif.html.
[18] https://www.grammy.com/nominees.
[19] *See* FAC at ¶ 61 and recording of performance of the Song in New Orleans on the Formation World Tour, attached as Exhibit 5.

PD.21335162.1

Beyoncé's performance of the Song during the halftime show at Super Bowl 50 (the "Super Bowl Performance")[20] also included audio from the YouTube Videos.  It did not.[21]

4.      **Plaintiffs' Alleged Ownership of Mr. Barré's Intellectual-Property Rights**

Plaintiffs allege that the "Estate of Anthony Barré received all ownership interests, including the copyrights and rights of copyright of the Late-Anthony Barré in the works of performance art upon his death in 2010."[22]  Plaintiffs also allege that Angel Barré, "in her capacity as the Independent Administrator of the Estate of Anthony Barré applied for and received copyright registrations" for the YouTube Videos.[23]  As alleged, Ms. Barré does not own any intellectual-property rights in the YouTube Videos.

## ARGUMENT

1.      **This Court May Consider the Works At Issue In This Case Because They Were Referred To In the FAC and Are Central To Plaintiffs' Claims.**

Plaintiffs allege that Defendants infringed their copyright and trademark rights in the YouTube Videos by using snippets in the sound recording and composition of the Song, the Music Video, the Live Performances, and the Super Bowl Performance (collectively "Defendants' Works").[24]  This Court may consider Defendants' Works and the YouTube Videos in connection with this motion because the FAC refers to each of the works, and the works are central to Plaintiffs' claims.  *Causey v. Sewell Cadillac-Chevrolet*, 394 F.3d 285, 288 (5th Cir. 2004) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").  Courts

---

[20] *See* FAC at ¶ 52.
[21] *See* recording of Beyoncé's Super Bowl Performance, attached as Exhibit 6.
[22] *See* FAC at ¶ 2.
[23] *See* FAC at ¶ 46.
[24] *See* FAC at ¶¶ 48, 49, 52 and 61.

routinely consider such works at the pleading stage in copyright and trademark actions,[25] including in cases where they dismiss copyright claims on fair-use grounds and trademark claims under the *Rogers* test.[26]

## 2.      Standards for Motions to Dismiss

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007).  Such factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555.  Courts do not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Great Lakes Dredge & Dock v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010).

## 3.      The Court Should Disregard Plaintiffs' Allegations Regarding the Sound Recording, the Composition, and the Super Bowl Performance.

Defendants did not use the YouTube Videos in the sound recording or composition of the Song, or in the Super Bowl Performance.[27]  Those works themselves refute Plaintiffs' allegations to the contrary.  Accordingly, the Court should disregard Plaintiffs' allegations regarding those works, and, as set forth in Argument § 8, all defendants without an alleged involvement in the Music Video or Live Performances should be dismissed with prejudice.

---

[25] *See, e.g., Randolph v. Dimension Films*, 630 F. Supp. 2d 741, 744 (S.D. Tex. 2009), *aff'd*, 381 Fed. Appx. 449 (5th Cir. 2010) (considering plaintiff's book and defendants' movie in granting motion to dismiss copyright, Lanham Act, and unfair-competition claims); *Faulkner Literary Rights v. Sony Pictures*, 953 F. Supp. 2d 701, 705 n.2, 712 (N.D. Miss. 2013) (same; granting motion to dismiss copyright and Lanham Act claims).

[26] *See, e.g., Faulkner*, 953 F. Supp. 2d at 708-712 (dismissing copyright claim on fair-use grounds); *Caner v. Smathers*, 2014 WL 12580461, at *4 (N.D. Tex. 4/17/14) (same); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 974 (C.D. Cal. 2007) (same); *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 (9th Cir. 2013) (affirming dismissal of Lanham Act claim under *Rogers* test); *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't*, 868 F. Supp. 2d 172, 183 (S.D.N.Y. 2012) (dismissing Lanham Act and state-law claims under *Rogers*).

[27] *See* Exhibits 1 and 6.

Plaintiffs' claims regarding the Music Video and Live Performances also should be dismissed with prejudice for the reasons set forth below.

**4.      Plaintiffs' Copyright Claim Is Barred By the Fair-Use Doctrine.**

Section 107 of the Copyright Act codifies the fair-use doctrine, which creates a "privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner." *Lewis Galoob Toys v. Nintendo*, 964 F.2d 965, 969 (9th Cir. 1992).  As the Supreme Court has explained, Section 107 balances "the interest of authors" in the "control and exploitation" of their works, and "society's competing interest in the free flow of ideas, information, and commerce[.]"  *Sony Corp. v. University City Studios*, 464 U.S. 417, 429 (1984).  To facilitate this balancing, Congress set forth four non-exclusive factors that courts must consider in determining whether a particular use of a copyrighted work is a fair use:

> (1)      the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)      the nature of the copyrighted work;
>
> (3)      the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)      the effect of the use upon the potential market for or value of the copyrighted work.

107 U.S.C. § 107.

"Because the defense of fair use is considered in its totality, the moving party is not required to prevail on every factor," *Norse v. Henry Holt & Co.*, 847 F. Supp. 142, 145 (N.D. Cal. 1994), and "need not 'shut-out' her opponent on the four factor tally to prevail," *Wright v. Warner Books*, 953 F.2d 731, 740 (2d Cir. 1991).  As explained below, the use of a few seconds of audio from the YouTube Videos is protected by the fair-use doctrine.

PD.21335162.1

A.        **The Purpose and Character of the Use**

The Supreme Court has explained that the "central purpose" of the first fair-use factor is to determine "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994) (internal quotation marks, brackets, and citations omitted). *See also Brownmark Films v. Comedy Partners*, 682 F.3d 687, 693 (7th Cir. 2012) (explaining that the purpose and character of a work depends on "whether the new work merely supersedes the original work, or instead adds something new with a further purpose or of a different character") (affirming dismissal based on fair use). This factor "asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579. Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Id.*

Where a "secondary use adds value to the original – if the original work is used as a raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Cariou*, 714 F.3d at 706. In *Cariou*, for example, artist Richard Prince altered photographs of Rastafarians from the plaintiff's book. *Id.* at 699-701. The court found that nearly all of the works were transformative because they "have a different character, give Cariou's photographs a new expression, and employ new aesthetics with creative and communicative results distinct from Cariou's." *Id.* at 708.

*Seltzer v. Green Day*, 725 F.3d 1170 (9th Cir. 2013), is instructive. In that case, the band Green Day used a slightly modified version of the plaintiff's illustration of a screaming face throughout a four-minute video that served as the backdrop during the group's performances of a song about "the violence that is done in the name of religion." *Id.* at 1173-1174. In finding that

- 9 -

Green Day's use was transformative, the court explained that the band used the plaintiff's illustration as "raw material" in the creation of the video, and that it "remains only a component of what is essentially a street-art focused music video about religion." *Id.* at 1176.

In addition to the use of copyrighted works as "raw material" in the creation of new works, transformative works also include those that are used for a wholly different purpose than the original. In *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006), for example, artist Jeff Koons took images from advertisements and superimposed them on backgrounds of pastoral landscapes. *Id.* at 247. The court found that Koons's use of the plaintiff's copyrighted photograph in this manner was transformative in that the parties had "sharply different objectives" in creating their respective works. *Id.* at 252. *See also Swatch Group v. Bloomberg*, 756 F.3d 73, 84-85 (2d Cir. 2014) (distribution of unedited recording of plaintiff's conference call was transformative because "the two works had different messages and purposes"); *Bill Graham Archives v. Dorling Kindersley*, 448 F.3d 605, 609 (2d Cir. 2006) (defendant's purpose in using plaintiff's works was "plainly different from the original purpose for which they were created," and thus transformative); *SOFA Entm't v. Dodger Prods.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (explaining that clip from *The Ed Sullivan Show* was "evidence of the band's enduring prominence in American music," and "[b]y using it as a biographical anchor, [defendant] put the clip to its own transformative ends"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (finding the copying of images for use as thumbnails in an internet search engine was transformative because the thumbnails served "an entirely different function" from the originals).

Here, the Music Video used a few seconds of the audio from the YouTube Videos as the "raw material" in the creation of a music video for a song about black Southern resilience that featured depictions of the history and culture of New Orleans and during the Live Performances

of the "New Orleans-themed" Song,[28] which also featured New Orleans-based personality Big

Freedia.  As in *Seltzer*, the snippets of audio from the YouTube Videos were "only a component"

of the Music Video and the Live Performances, and as in *Cariou*, they "employed new aesthetics

with creative and communicative results distinct from" the YouTube Videos.

In addition, the Music Video and Live Performances used the snippets from the YouTube

Videos for an entirely different purpose than the originals.  In the YouTube Videos, Mr. Barré

speaks stream-of-consciousness to the camera as he walks the streets of New Orleans, in one

video criticizing several woman he knew, and in the other complimenting a woman's hair.

Defendants used the short audio snippets for a very different purpose.  As Plaintiffs observe,

Defendants used them to "create the tone, mood, setting and location of the New Orleans-themed

'Formation.'"[29]  This highly transformative use weighs heavily in favor of fair use.[30]

### B.    The Nature of the Copyrighted Work

When considering the second fair-use factor, courts evaluate "[w]hether or not a work is

published," because "the scope of fair use is narrower with respect to unpublished works."  *Arica*

*Inst. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (finding this factor weighed in favor of fair

use because plaintiff's book "is a published work available to the general public").  *See also*

*Swatch*, 756 F.3d at 87, 89 (same; plaintiff "was not deprived of the ability to control the first

public appearance of its expression"); *Seltzer*, 725 F.3d at 1178 (finding that plaintiff "controlled

the first public appearance of his work," and its wide dissemination "weigh[ed] in favor of the

fair use of that work") (internal quotation marks omitted).

---

[28] *See* FAC at ¶ 1.

[29] FAC ¶¶ 1, 65.   In addition, Mr. Barré's accent and dialect are common to many New Orleans locals and evoke a connection to the city.  *See* FAC ¶ 39.

[30] While courts also consider whether a particular use is "commercial" in nature, that determination is "of little significance" where a defendant's use of a copyrighted work is transformative.  *SOFA*, 709 F.3d at 1278-1279.

Here, Mr. Barré published the YouTube Videos on the Internet in 2010 – more than five years before the Music Video's premiere and the Live Performances.[31]  Plaintiffs thus cannot dispute that Mr. Barré controlled the "first public appearance" of the YouTube Videos, or that the second factor weighs in favor of fair use.[32]

## C.  Substantiality of the Use

The third fair-use factor "asks whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal quotations omitted).  This factor "captures the fact that an allegedly infringing work that copies little of the original is likely to be a fair use." *Seltzer*, 725 F.3d at 1178.  In *SOFA*, for example, the defendant used a seven-second clip from *The Ed Sullivan Show* in a musical about The Four Seasons.  Plaintiff argued that while seven seconds was not a quantitatively significant amount, it constituted a qualitatively significant amount because it "attempted to capitalize on the central and most beloved part" of the show – Ed Sullivan's introduction of new acts.  709 F.3d at 1279.  The court rejected this argument, finding that the defendant's use was quantitatively and qualitatively insignificant, and explaining that plaintiff could not protect Ed Sullivan's "charismatic personality," which was "not copyrightable."  *Id.*  The court found in favor of the defendant, explaining that the use of the clip "did not harm [plaintiff's] copyright in *The Ed Sullivan Show*, and society's enjoyment of [defendant's] creative endeavor is enhanced with its inclusion."  *Id.* at 1280.  The court also

---

[31] Exhibits 3 and 4; Compl., Exhibits A and B.

[32] This factor also "recognizes the fact that 'some works are closer to the core of intended copyright protection than others.'"  *Seltzer*, 725 F.3d at 1178.  However, courts have found this factor to be "of limited usefulness" where, like here, plaintiff's work "is being used for a transformative purpose."  *Bill Graham*, 448 F.3d at 612.  *See also Sony Comp. v. Bleem*, 214 F.3d 1022, 1028 (9th Cir. 2000) ("The Supreme Court has passed over this [second] factor without giving it much attention, stating that it is often 'not much help.'").

affirmed the district court's award of attorneys' fees to the defendant because the plaintiff "should have known … that its chances of success in this case were slim to none."  *Id.*

Here, the Music Video used *only the audio* from about four seconds of a five-minute-and-fourteen-second clip and about six seconds of a one-minute-and-fifty-three second clip.  The Live Performances used only the six seconds of audio from the second clip.  Because this is an insignificant amount of the YouTube Videos, this factor weighs strongly in favor of fair use.

### D.       The Effect on the Market for the YouTube Videos

Under the fourth fair-use factor, courts weigh "the effect of the secondary use upon the potential market for the value of the copyrighted work."  *Cariou*, 714 F.3d at 708.  The "concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use *usurps the market* of the original work."  *Blanch*, 467 F.3d at 258 (emphasis added).  In *Cariou*, for example, the court found no effect on the potential market for plaintiff's works because he "has not actively marketed his work or sold his work for significant sums, and nothing in the record suggests that anyone will not now purchase Cariou's work."  714 F.3d at 709.  *See also Blanch*, 467 F.3d at 258 (finding that this factor "greatly favors" defendant because "Koons's use of her photograph did not cause any harm to her career or upset any plans she had for [the work] or any other photograph" and the "value of [the work] did not decrease as the result of Koons's alleged infringement").

Even accepting Plaintiffs' factual allegations as true, they do not plausibly establish that the use of ten (or fewer) seconds of audio from the YouTube Videos will usurp the market for those works, if any such market exists.  Plaintiffs do not make any factual allegations that Mr. Barré or his Estate sold or licensed any of the videos that Mr. Barré posted to YouTube, or that the Music Video or Live Performances somehow harmed the monetary value of the YouTube Videos.  In addition, Plaintiffs' allegation that Ms. Barré did not become the administrator of the

Estate until February 25, 2016 (FAC ¶ 2) – more than five years after Mr. Barré's death and

several weeks after the Music Video premiered – suggests that no market existed before that date

that would have required having an administrator.  Plaintiffs' allegations simply do not plausibly

establish that the Music Video and Live Performances usurped any market for the YouTube

Videos – if anything, they helped (or perhaps even created) that market.  *See Maxtone-Graham v.*

*Burtchaell*, 803 F.2d 1253, 1264 (2d Cir. 1986) ("[I]t is not beyond the realm of possibility that

[defendant's] book might stimulate further interest in [plaintiff's work].").[33]  Because Plaintiffs

"suffered absolutely no economic injury whatever from the alleged infringement of [their]

copyright," *Triangle Pubs. v. Knight-Ridder Newspapers*, 626 F.2d 1171, 1177 (5th Cir. 1980),

this factor weighs in favor of fair use.[34]

　　　All four factors weigh in favor of fair use.  Accordingly, Plaintiffs' copyright-

infringement claim should be dismissed with prejudice.

**5.　　Plaintiffs' False-Endorsement Claim Fails to State a Claim.**

　　　**A.　　The Brief Use of Mr. Barré's Voice Does Not Give Rise to a False-
　　　　　　Endorsement Claim.**

　　　Perhaps anticipating the strength of Defendants' fair-use defense, Plaintiffs attempt to

bootstrap a false-endorsement claim onto this straightforward copyright dispute.  But numerous

---

　　　[33] Reviewing publicly available resources to determine the popularity of the YouTube Videos shows they received significantly more views, and Mr. Barré's YouTube channel significantly more subscribers, following the release of the Music Video in January 2016 and when Plaintiffs filed this lawsuit in February 2017.  https://socialblade.com/youtube/user/theehhgz/monthly.  Similarly, "Google Trends" shows that interest in Mr. Barré spiked in January 2016 and February 2017.  https://trends.google.com/trends/explore?q=%22Messy%20Mya%22.  *See* Fed. R. Evid. 201; *Brownmark Films v. Comedy Partners*, 2011 WL 6002961, at *1 (E.D. Wis. 11/30/11) (noting that YouTube video at issue had over 43 million views).

　　　[34] Even if Plaintiffs alleged that Defendants sought permission to use the YouTube Videos, that fact would not have any relevance to a fair-use assessment.  *See, e.g., Campbell*, 510 U.S. at 585 n.18 (defendants' attempt to obtain a license does "not necessarily suggest that they believed their version was not fair use; the offer may simply have been made in a good-faith effort to avoid this litigation").

PD.21335162.1

courts have considered – and uniformly rejected – Plaintiffs' argument that the mere use of a copyrighted work implies an affiliation with the creator or subject of that work. *See, e.g., Oliveira v. Frito-Lay*, 251 F.3d 56, 62 (2d Cir. 2001) (defendants' use of plaintiff's "signature" song in a commercial did not give rise to false-endorsement claim); *Henley v. DeVore*, 733 F. Supp. 2d 1144, 1167-1168 (C.D. Cal. 2010) (rejecting false-endorsement claim because "the use of a performance does not violate any trademark right of the performer," and noting that "many artists are closely associated with their works, yet are not afforded trademark protection").[35]

There is no precedent for allowing a performer to assert trademark rights in a performance, no matter how famous. *See, e.g., Oliveira*, 251 F.3d at 62 ("Plaintiff has not cited a single precedent throughout the history of trademark supporting the notion that a performing artist acquires a trademark or service mark signifying herself in a recording of her own famous performance."); *Henley*, 733 F. Supp. 2d at 1168 (recognizing "this absence of authority for the Plaintiffs' theory and declines to create a new trademark right"). In *Oliveira*, the singer of the song "The Girl from Ipanema" alleged that the use of the song in the defendants' television commercial constituted false endorsement because "she has become known as The Girl from Ipanema and is identified by the public with the [song]," and thus claimed trademark rights in the performance. 251 F.3d at 59. In rejecting her false-endorsement claim, the court explained that recognizing such rights would be "profoundly disruptive to commerce." *Id.* at 63. Among other things, the court noted that "artists who could assert claims similar to [plaintiff's] would bring suit against entities that had paid bona fide license fees to all known holders of rights." *Id.*

---

[35] *See also EMI Catalogue Partnership v. Hill, Holliday,* 228 F.3d 56, 64 (2d Cir. 2000) ("[t]he creation and expression of an original work is protected by copyright law, and once an original work has been produced trademark law is not the proper means of protecting the rights in this originality"); *Beastie Boys v. Monster Energy,* 66 F. Supp. 3d 424, 448 (S.D.N.Y. 2014) (same).

The rule set forth in these cases comports with the U.S. Supreme Court's opinion in *Dastar*, in which the court rejected a Lanham Act claim against a video publisher for repackaging and selling under its own name a television series that had fallen into the public domain.  539 U.S. at 26-27.  The court explained that the rights of copyright owners are "part of a carefully crafted bargain," and that recognizing a Lanham Act claim in a copyrighted work that fell into the public domain would "be akin to finding that [trademark law] created a species of perpetual patent and copyright, which Congress may not do."  *Id.* at 37.

Whether Defendants had the right to use the snippets of audio from the YouTube Videos – whether by license or under the fair-use doctrine – must be determined under *copyright* law.  Plaintiffs do not have any *trademark* interest in the YouTube Videos, and the recognition of any such interest would create the perpetual right in those works that the Supreme Court refused to recognize in *Dastar*.[36]  Courts have rejected the contention that Plaintiffs advance – that the use of the YouTube Videos has "given the impression that Mr. Barré's estate authorized and endorsed" Defendants' works, FAC ¶ 116 – and this Court should reject it as well.

### B.     The First Amendment Bars Plaintiffs' False-Endorsement Claim.

Even if courts recognized the use of a copyrighted work as an endorsement under the Lanham Act – which they do not – Plaintiffs' false-endorsement claim independently would be barred by the First Amendment.  As the Fifth Circuit has recognized, there is a "tension between the protection afforded by the Lanham Act to trademark owners and the protection afforded by

---

[36] This is particularly true given that there is nothing in the Music Video or Live Performances that could plausibly constitute "misleading or false statements" about Mr. Barré's relationship with Defendants.  *Dryer v. NFL*, 814 F.3d 938, 944 (8th Cir. 2016) (rejecting false-endorsement claim in the absence of any statements that "convey a false impression, are misleading in context, or are likely to deceive consumers") (internal brackets omitted).  *See also Beastie Boys*, 66 F. Supp. 3d at 448 (explaining that false-endorsement claims require "a false or misleading representation of fact").  In fact, Plaintiffs expressly allege the opposite – that Defendants *failed* to make any statement regarding their use of Mr. Barré's voice.  FAC ¶ 1.

the First Amendment to expressive activity." *Westchester Media v. PRL USA Holdings*, 214

F.3d 658, 664 (5th Cir. 2000).  The Second Circuit addressed this tension in *Rogers v. Grimaldi*,

in which the iconic entertainer Ginger Rogers brought Lanham Act and other claims against the

producers of the film *Ginger and Fred*.  875 F.2d at 996.  While the title of the film alluded to

Rogers's collaboration with Fred Astaire, the story was about fictional cabaret performers who

become known in Italy as "Ginger and Fred."  *Id.* at 996-997.  The court recognized that because

titles combined "artistic expression and commercial promotion" – which were "inextricably

intertwined" – they required "more protection than the labeling of ordinary commercial

products."  *Id.* at 998.  It then announced what has become known as the *Rogers* test:  the

Lanham Act does not apply to allegedly misleading titles "unless the title has no artistic

relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title

explicitly misleads as to the source of the content of the work."  *Id.* at 999.[37]

     A decade later, the Fifth Circuit adopted the *Rogers* test in a Lanham Act case involving

titles.  *Westchester*, 214 F.3d at 664-665 (reciting the *Rogers* test and noting that "[t]his Circuit

has adopted the Second Circuit's approach").  While the Fifth Circuit has not yet had an occasion

to extend the *Rogers* test beyond titles, almost every court to consider the issue has done so, and

the *Rogers* test has become the controlling standard for determining whether the First

Amendment bars Lanham Act claims arising from the use of a mark in an expressive work.[38]

---

     [37] In its application of this two-part test, the court rejected Rogers's Lanham-Act claim
because the title surpassed the "minimum threshold of artistic relevance to the film's content"
and did not contain an "overt claim" that Rogers endorsed the film.  *Id.* at 1001.

     [38] *See, e.g., Cliffs Notes v. Bantam Doubleday Dell*, 886 F.2d 490, 495 (2d Cir. 1989)
(holding that "the *Rogers* balancing approach is generally applicable to Lanham Act claims
against works of artistic expression"); *E.S.S. Entm't 2000 v. Rock Star Videos*, 547 F.3d 1095,
1099 (9th Cir. 2008) ("Although [the *Rogers* test] traditionally applies to uses of a trademark in
the title of an artistic work, there is no principled reason why it ought not also apply to the use of

Applying the *Rogers* test, this Court must dismiss Plaintiffs' claim if: (1) the use of Mr. Barré's voice had *any artistic relevance* to Defendants' expressive activity, namely, the Music Video and Live Performances; and (2) Defendants did not *expressly* mislead the public as to whether there was any sponsorship or affiliation between them and Mr. Barré.[39]

### i.   As Plaintiffs Acknowledge, the Use of Mr. Barré's Voice Has Artistic Relevance to the Music Video and Live Performances.

The first prong of the *Rogers* test is satisfied if the alleged mark has *any* artistic relevance to the underlying work. *See Rogers*, 875 F.2d at 999 (first prong is satisfied "unless the title has no artistic relevance to the underlying work whatsoever"). Courts have interpreted this requirement to mean that the "level of relevance" of an alleged mark to the work "merely must be above zero." *E.S.S.*, 547 F.3d at 1100. This "black-and-white rule" allows a straightforward application of *Rogers* by limiting the court's "need to engage in artistic analysis in this context." *Brown*, 724 F.3d at 1243 (affirming dismissal of false-endorsement claim).

---

a trademark in the body of the work."); *Univ. of Alabama v. New Life Art*, 683 F.3d 1266, 1278 (11th Circ. 2012) (expressing "no hesitation in joining our sister courts by holding that we should construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark," and applying *Rogers* to "paintings, prints, and calendars"); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 928 n.11 (6th Cir. 2003) (explaining that the *Rogers* test is "generally applicable to all cases involving literary or artistic works where the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment"); *Louis Vuitton*, 868 F. Supp. 2d at 177 (applying *Rogers* test to the use of trademark in defendant's film).

[39] It is beyond dispute that the Music Video is an expressive work entitled to full First Amendment protection. The Music Video is highly creative and visually complex, and provides social and political commentary about a range of relevant topics and ideas. Indeed, at least one court has explained that music videos "require the same level of artistic and creative input from the performers, actors, and directors as is required in the making of motion pictures." *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001) (holding that music videos were indistinguishable from short films and entitled to full First Amendment protection). *See also Brown*, 724 F.3d at 1241 (explaining that expressive works, including video games, "communicate ideas – even social messages – through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium"). The Music Video's communication of ideas and social messages confer upon it the full protections of the First Amendment.

Here, Plaintiffs expressly allege that Defendants used the snippets from the YouTube Videos to "create the tone, mood, setting and location of the New Orleans-themed 'Formation.'" FAC ¶¶ 1, 65. Plaintiffs also allege that Mr. Barré's "voice and words … reach the very essence of 'Formation' and are crucial to 'Formation.'"[40] As a result, there cannot be any dispute that Mr. Barré's voice has artistic relevance to the Music Video and Live Performances, and that the first prong of the *Rogers* test is easily satisfied.

### ii.   As Plaintiffs Acknowledge, Defendants Did Not Expressly Mislead About Any Affiliation With Mr. Barré.

The second prong of the *Rogers* test is satisfied if defendants did not "expressly mislead[] as to the source or the content of the work" at issue. *See Rogers*, 875 F.2d at 999. To "expressly mislead" in this context, the defendants must have made an "overt claim" or "explicit indication" that the plaintiff endorsed or was involved with the work. *Id.* at 1001 ("The title 'Ginger and Fred' contains no explicit indication that Rogers endorsed the film or had a role in producing it"). Importantly, courts have made clear that the mere use of the mark itself – or, in this case, the use of Mr. Barré's voice – is not expressly misleading on its own. *See, e.g., Mattel v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002) (explaining that if use of the alleged mark alone was sufficient to expressly mislead, "it would render *Rogers* a nullity"); *E.S.S.*, 547 F.3d at 1100 ("[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading.").[41]

This requirement of an "overt claim" beyond the mere use of the alleged trademark applies even where consumers mistakenly believe there is some connection between the mark owner and the expressive work. In *ETW*, for example, the Sixth Circuit found that a painting of

---

[40] *See* FAC at ¶ 74.

[41] As the *E.S.S.* court explained, "a trademark infringement claim presupposes a use of the mark. If that necessary element in every trademark case vitiated a First Amendment defense, the First Amendment would provide no defense at all." *E.S.S.*, 547 F.3d at 1099.

Tiger Woods did not expressly mislead as to any endorsement despite survey evidence that sixty-two percent of survey respondents believed the golfer had "an affiliation or connection" with the painting "or that he has given his approval or has sponsored it."  332 F.3d at 918, 937 n.19. Similarly, the *Rogers* court found that the defendants did not expressly mislead despite evidence that "some members of the public would draw the incorrect inference that Rogers had some involvement with the film."  875 F.2d at 1001.  The court explained that any "risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act."  *Id.*[42]

Here, Plaintiffs concede that Defendants did not make any "overt claim" or "explicit indication" that Mr. Barré sponsored or was otherwise affiliated with the Music Video or Live Performances.  In fact, Plaintiffs repeatedly allege that Mr. Barré was "not properly credited for his contributions," and that Plaintiffs have received "no acknowledgement" and "no credit."[43] Because there is no allegation that Defendants expressly misled consumers about the source or sponsorship of the Music Video or Live Performances beyond the mere use of YouTube Videos,

---

[42] In *Westchester*, the Fifth Circuit explained that it "adopted the Second Circuit's approach," which it described as requiring a "particularly compelling" showing under a likelihood-of-confusion analysis.  214 F.3d at 664-665.  Since then, numerous courts have made clear that, as in *Rogers* itself, no other analysis is required in the absence of an explicit claim of affiliation or sponsorship.  *See, e.g., Rogers*, 875 F.2d at 1001; *MCA Records*, 296 F.3d at 902 (rejecting Lanham Act claim where song title "does not explicitly mislead as to the source of the work"); *ETW*, 332 F.3d at 926 (explaining that "where the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment, the likelihood of confusion test is not appropriate because it fails to adequately consider the interests protected by the First Amendment"); *Univ. of Alabama*, 683 F.3d at 1279; *Stewart Surfboards v. Disney Book Grp.*, 2011 WL 12877019, at *7 (C.D. Cal. 5/11/11).
[43] *See* FAC at ¶ ¶ 47, 1; FAC at ¶ 116 (alleging a "continuing failure to acknowledge Mr. Barré's contribution").

- 20 -

this second prong of the *Rogers* test also is satisfied.  Accordingly, the *Rogers* test bars

Plaintiffs' Lanham Act claim, which should be dismissed with prejudice.[44]

**6.      Plaintiffs' State-Law Claims Also Must Be Dismissed.**

      **A.      Plaintiffs' State-Law Unfair-Competition Claim Fails for the Same Reasons As Their Lanham Act Claim.**

      Plaintiffs assert a violation of Louisiana's Unfair Trade Practices and Consumer

Protection Act ("LUTPA"), La. R.S. 51:1405, based on the same alleged conduct as their

Lanham Act claim.[45]  As the Fifth Circuit has recognized, "the requirements for a claim under

LUTPA mirror those of the Lanham Act," and so the claims stand or fall together.  *Bd. of*

*Supervisor v. Smack Apparel*, 550 F.3d 465, 490 n.130 (5th Cir. 2008) (court's trademark

analysis "applied with equal force" to the LUTPA claim).  *See also Louisiana World Expo. v.*

*Logue*, 746 F.2d 1033, 1039 (5th Cir. 1984) (analyzing Lanham Act and LUTPA claims

together).  This specifically includes cases in which a Lanham Act claim is dismissed on First-

Amendment grounds.  *See, e.g., Rin Tin Tin, v. First Look Studios*, 671 F. Supp. 2d 893, 902

(S.D. Tex. 2009) ("[W]here the First Amendment applies to protect titles and works from federal

claims of confusion and dilution, it also extends to state-based claims of infringement, dilution,

and unfair competition.").[46]

---

    [44] The allegation that Big Freedia said "bitch I'm back by popular demand" during the Live Performances does not salvage the Lanham Act claim.  *See* FAC ¶ 63.  Plaintiffs do not plausibly establish that this particular phrase serves as a source identifier for Plaintiffs' goods or services, particularly given that the phrase "back by popular demand" is well known and widely used.  In addition, even if Plaintiffs could somehow establish ownership of that phrase as a trademark, the *Rogers* test would still bar the claim as a matter of law.

    [45] *Compare* FAC at ¶ 122 (alleging a violation of LUTPA "by digitally sampling, using and exploiting Anthony Barré's actual voice, reputation and personality") *with* FAC at ¶ 112 (alleging a violation of the Lanham Act because the "unauthorized use of Anthony Barré's actual, distinctive voice, words and performance").

    [46] *See also Seltzer*, 725 F.3d at 1180 n.1 (explaining that the court has "consistently held" that Lanham Act and state-law unfair-competition claims were "substantially congruent"); *Slep-*

PD.21335162.1

Because Plaintiffs' state unfair-competition claim is predicated on the same alleged conduct as their federal unfair-competition claim, it fails for the same reasons and should be dismissed with prejudice.[47]

**B.      Plaintiffs' Unjust-Enrichment Claim Fails as a Matter of Law.**

**i.      It Is Preempted By the Copyright Act.**

The federal Copyright Act preempts a state-law claim when the work in question "come[s] within the subject matter of copyright" and when "the right that the author seeks to protect" is "equivalent to any of the exclusive rights within the general scope of copyright." *GlobeRanger Corp. v. Software AG*, 836 F.3d 477, 484 (5th Cir. 2016) (emphasis omitted).  As the Fifth Circuit emphasized, "[c]opyright grants creators the exclusive right to copy their work," so a state-law claim is preempted "when the conduct for which the plaintiff is seeking protection under state law amounts to the copying that copyright law also proscribes." *Id.*

In particular, courts in the Fifth Circuit routinely find that unjust-enrichment claims are preempted by federal copyright law.  *See, e.g., McConley v. Boise*, 2006 WL 709599, at *5

---

*Tone v. Sellis Enterprises*, 87 F. Supp. 3d 897, 903 (N.D. Ill. 2015) ("Lanham Act claims and claims under the Illinois Uniform Deceptive Practices Act are similarly subject to the same standard."); *Louis Vuitton*, 868 F. Supp. 2d at 184 (dismissing plaintiff's "common law claim of unfair competition" because it was "based on the same permissible conduct as its Lanham Act claim").

[47] To the extent Plaintiffs' LUTPA claim is based on allegations that Defendants converted their intellectual property, it fails for the same reasons as their copyright claim.  *See Nola Spice Designs v. Haydel*, 969 F. Supp. 2d 688, 704 (E.D. La. 2013) ("In light of the finding that [defendant] did not infringe on [plaintiff]'s trademarks or copyrights, [plaintiff] is not entitled to damages under LUTPA.").  Even if the claim is not predicated on the same allegations as the copyright *or* Lanham-Act claims, it *still* fails as the allegations are insufficient to support a LUTPA claim. The "range of prohibited practices under LUTPA is extremely narrow." *Cheramie Services v. Shell*, 35 So. 3d 1053, 1060 (La. 2010).  "To succeed on a LUTPA claim, a plaintiff must show that the alleged conduct 'offends established public policy … and is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'" *Cargil v. Degesch*, 875 F. Supp. 2d 667, 676 (E.D. La. 2012).  The FAC contains no allegations that remotely approach the "extremely narrow" range of actions that violate LUTPA.

PD.21335162.1

(W.D. La. 3/21/06) ("As a general rule, courts hold that unjust enrichment claims are qualitatively equivalent to a cause of action for copyright infringement and are preempted by the Copyright Act."); *Dorsey v. Money Mack Music*, 304 F. Supp. 2d 858, 865 (E.D. La. 2003) ("Preemption is appropriate in the majority of instances because the typical unjust enrichment claim is qualitatively equivalent to a cause of action for copyright infringement.").

Plaintiffs' unjust-enrichment claim alleges that "Defendants have been unjustly enriched by their unauthorized use of Anthony Barré's actual voice" because "Defendants never contracted with plaintiffs to use" his voice.  FAC ¶¶ 128, 130.  This is nothing more than a claim that Defendants have reproduced and used a copyrighted recording of Mr. Barré's voice – in other words, a copyright claim.  Thus, Plaintiffs' unjust-enrichment claim is preempted.

### ii.    An Unjust Enrichment Claim Is Not Available To Plaintiffs.

Article 2298 of the Louisiana Civil Code provides that unjust enrichment "shall not be available if the law provides another remedy."  As one court explained, "unjust enrichment principles are only applicable to *fill a gap in the law* where no express remedy is provided." *Coastal Envtl. Specialists v. Chem-Lig Int'l*, 818 So. 2d 12, 19 (La.App. 1st Cir. 2001) (emphasis added).  Importantly, whether a plaintiff can *prevail* on other claims is irrelevant – unjust-enrichment claims are appropriate *only* if there is a "gap in the law" that wholly prevents any potential recovery for a wrong committed by the defendant.  *Id*. at 20.  Here, while Plaintiffs' causes of action fail to state valid claims, there is no "gap in the law" that allows recovery under Louisiana's unjust-enrichment law.

### 7.    Angel Barré Lacks Standing.

To establish a copyright-infringement or trademark-infringement claim, the plaintiff must own the intellectual-property rights at issue.  *See Gen. Universal Sys. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (plaintiff must prove "ownership of a valid copyright"); *Paulsson Geophysical*

*Servs. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (trademark plaintiff must "first show that it has a protectable right in the mark"). While there are two named plaintiffs in this case, the FAC alleges that only one of them owns any rights in the alleged copyright and trademarks at issue. Specifically, the FAC alleges that "[t]he Estate of Anthony Barré received *all ownership interests*, including the copyrights and rights of copyright of the Late-Anthony Barré in the works of performance art upon his death in 2010." FAC ¶ 2 (emphasis added). It later alleges that Ms. Barré "in her capacity as the Independent Administrator of the Estate of Anthony Barré applied for and received copyright registrations" for the YouTube Videos. FAC ¶ 46.

Because the complaint does not allege anywhere that Angel Barré owns any rights to the intellectual property at issue in this lawsuit, she lacks standing to assert the claims in the FAC. *See, e.g., Christopher & Banks Corp. v. Dillard's, Inc.*, 805 F. Supp. 2d 693, 696 (S.D. Iowa 2011) (dismissing two co-plaintiffs because complaint alleged that only one entity owned the copyright at issue).[48] Accordingly, to the extent that any claims survive this motion, Ms. Barré should be dismissed.

**8. Defendants Not Involved In the Music Video Or Live Performances Should Be Dismissed With Prejudice.**

Only the Music Video and Live Performances used any part of the YouTube Videos – not the Song's sound recording or composition or the Super Bowl Performance. The FAC did not – and cannot – allege that the following defendants had any involvement in the Music Video or Live Performances: Parkwood Entertainment, Michael L. Williams, Khalif Brown, Asheton Hogan, WB Music Corporation, Warner-Tamerlane Publishing Corp., Eardrummers Music

---

[48] It is also unclear whether the Estate even owns the copyright to the video entitled "Booking the Hoes from New Wildin." Mr. Barré did not film the video himself, and Plaintiffs do not allege how Mr. Barré or the Estate obtained the rights from the videographer.

Publishing, and Oakland 13 Music.  To the extent that any claims survive this motion, these

defendants should be dismissed with prejudice.

## CONCLUSION

Defendants respectfully request that this Court dismiss Plaintiffs' lawsuit in its entirety

with prejudice.

Respectfully submitted,

**PHELPS DUNBAR LLP**

/s/ Mary Ellen Roy
Mary Ellen Roy, T.A. (La. Bar #14388)
Dan Zimmerman (La. Bar #2202)
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
roym@phelps.com
dan.zimmerman@phelps.com

Alonzo Wickers IV
(*pro hac vice* application pending)
Nicolas A. Jampol
(*pro hac vice* application pending)
**DAVIS WRIGHT TREMAINE LLP**
865 S Figueroa Street, Suite 2400
Los Angeles, CA 90017
Telephone: (213) 633-6800
Telecopier: (213) 633-6899
alonzowickers@dwt.com
nicolasjampol@dwt.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 14th day of April, 2017 electronically filed the
foregoing with the Clerk of Court by using the CM/ECF system which will send notice of
electronic filing to all counsel of record.

/s/ Mary Ellen Roy